## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Reco Wilson, K89416,

    *Petitioner*,

v.

Mark Williams, Warden,

    *Respondent*.

No. 22 CV 1285

Judge Lindsay C. Jenkins

### MEMORANDUM OPINION AND ORDER

Petitioner Reco Wilson ("Wilson" or "Petitioner"), a prisoner incarcerated at Hill Correctional Center, brings this habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his conviction in the Circuit Court of Cook County. For the reasons explained below, the Court denies the petition [Dkts. 1, 8]. The Court directs the Clerk to enter judgment against Petitioner and in favor of Respondent. Civil case terminated.

## I.    Background

The following facts are drawn from the state court record, which Respondent has submitted in accordance with Rule 5(c) of the Rules Governing Section 2254 Cases. [Dkt. 16]. The state court findings of fact are presumed correct, and Wilson has the burden of rebutting the presumption of correctness by clear and convincing evidence. *Brumfield v. Cain*, 576 U.S. 305, 323 n.8 (2015) (citing 28 U.S.C. § 2254(e)(1)).

Wilson was charged in the Circuit Court of Cook County with the first-degree murder of Deon Gardner ("Gardner") on an accountability theory, after Gardner was killed by Wilson's co-defendant, Marcel Milton ("Milton") during a carjacking on March 22, 2004. See *People v. Wilson*, 2020 IL App (1st) 171995-U, 2020 WL 4334805, ¶ 5 (Ill. App. July 24, 2020). The evidence at trial (which is discussed in greater detail below) showed that in March 2004, Wilson asked Sergio Wray ("Wray") to help move a Jeep Grand Cherokee that Wilson and Milton had stolen. *Id.*, ¶ 6. Instead, Wray decided to keep the Jeep for himself. *Id.* A few days later, Wilson saw Wray driving in the Jeep, called Milton, and told Milton to go retrieve the vehicle, knowing that Milton would be armed with a gun. Milton found the Jeep, which was occupied by Wray, Gardner and a third man, Lamar Murphy ("Murphy"). Milton fired his gun at the men, killing Gardner. *Id.*, ¶ 7.

### A. Investigation

At the time CPD was investigating Gardner's death, Wilson was being held in Cook County Jail ("Jail") on unrelated charges. [See Dkt. 16-1 at 5 (Order, *People v. Wilson*, No. 1-08-2836 (Ill. App. 1st Dist. June 30, 2010)).] Detectives removed Wilson from the Jail and questioned him about the murder. *Id.* In a video-recorded statement, Wilson related the following:

> [E]arlier that day [March 22, 2004], he saw the Jeep near East 69th Street and South Cottage Grove Avenue. He related that he had contacted Milton on his cell phone and told him that he was following the Jeep. He told Milton to bring an extra set of keys to retrieve the vehicle. Petitioner then called his cousin to give Milton a ride. He followed the Jeep to 69th and Michigan, where he observed the occupants exit the vehicle and enter a building. In the videotaped statement, Petitioner acknowledged that he knew Milton carried a gun

2

in such situations and admitted that he thought Milton would bring a gun to retrieve the Jeep. He also stated that when he later called Milton on his cell phone to tell him to hurry, Milton stated that he had his "blow on [him]." Petitioner explained that "blow" referred to a gun. He observed Milton's arrival to retrieve the Jeep and the firing of the initial two shots at Murphy and Wray. As Petitioner drove away, he looked in his rearview mirror and saw Milton shoot Gardner once as he exited the Jeep and twice as he lay on the ground.

*Wilson*, 2020 IL App (1st) 171995-U, ¶ 8.

### B. Pre-trial Motions

Wilson moved to quash his arrest and suppress the recorded statement, arguing that the police did not have probable cause to remove him from the Jail for questioning. [See Dkt. 16-13 (motion to quash arrest and suppress evidence); Dkt. 16-1 at 4-5.] At the hearing on Wilson's motion, Detective Patrick Ford ("Ford") testified concerning why police officers decided to remove Wilson from Jail. According to Ford:

> [T]he day after the murder, Wray told him that he had taken the Jeep from a gang member five days before the murder. Wray then viewed a photo array and identified defendant as the person from whom he had taken the Jeep. Detective Ford testified that [Wilson] and [Milton] were associates who were known to police for working together in a stolen automobile ring, and they had recently been named together as offenders in another case involving an aggravated battery and carjacking. Wray subsequently viewed another photo array and identified [Milton] as the gunman who shot Gardner. Wray told police that he believed Gardner was killed because Wray had stolen the Jeep from [Wilson] and [Milton]. Police recovered the Jeep one block from defendant's home.

[Dkt. 16-1 at 5.] The trial court concluded that officers had probable cause to arrest Wilson and denied his motion to quash his arrest and suppress the recorded statement. [*Id.* at 5-6.]

3

After the motion to quash and suppress was denied, Wilson filed a motion to suppress his recorded statement on the basis that it was involuntary. [See Dkt. 16-14 (motion to suppress statements).] At the hearing on that motion, Wilson testified that the questioning officers did not inform him of his *Miranda* rights and falsely promised that he would not be charged with murder if he confessed. [See Dkt. 161-15 at 301-302 (transcript).] Wilson further testified that when he refused to give a statement, Ford struck him, grabbed him by the throat, and hit his head into the wall. [*Id.* at 302-303.] After Wilson fell to the floor, Ford put his knee in Wilson's back and another detective stood on Wilson's hands. Ford then hit Wilson three or four times. [*Id.* at 303.] An Assistant State's Attorney, Jeanne Bischoff ("Bischoff") came into the room and told Wilson what to say in his recorded statement. [*Id.* at 306.]

Ford, Bischoff, and the three other police detectives involved in the questioning also testified at the suppression hearing and contradicted Wilson's account. [See Dkt. 16-1 at 6.] More particularly, Ford testified that he advised Wilson of his *Miranda* rights and Wilson waived those rights prior to giving his statement. [*Id.*] Ford also denied hitting Wilson or promising him that he would not be charged with murder if he made a statement. [*Id.*] Three other detectives testified that they did not strike or otherwise abuse Wilson. [*Id.* at 7.] Bischoff denied that she told Wilson what to say and testified that Wilson never told her that he had been abused by police. [*Id.* at 6-7.] After hearing this testimony and reviewing the recorded statement, the trial court denied the motion to suppress, concluding that Wilson's allegations were not credible and his recorded statement was voluntary. [*Id.* at 7.]

4

### C. Trial

Wilson and Milton were tried in a simultaneous, but severed, bench trial. See *Wilson*, 2020 IL App (1st) 171995-U, ¶ 2. Wray, Murphy and Wilson himself testified at the trial. The State also introduced Wilson's recorded statement. Wray testified as follows: On March 17 or 18, 2004, Wray was walking down the street when Wilson drove up and asked would Wray help move a car. [Dkt. 16-1, at 2.] Wray did not personally know Wilson but recognized him from the neighborhood and agreed to move the car. [*Id*.] Wilson drove Wray to the area of 78th Street and Lake Shore Drive, handed him the keys to a silver Jeep Grand Cherokee, and told Wray to follow him in the Jeep to 77th Street and Yates Boulevard. Wray lost sight of Wilson in traffic and decided to keep the Jeep. [*Id*.]

Wray further testified that on March 22, 2004, he was at his friend Murphy's apartment watching movies with a group of people, including Gardner. The Jeep was parked on the street in front of Murphy's building. Around 9:00 p.m., Murphy asked Wray to drive him and Gardner to Gardner's house to pick up more movies. Wray agreed and told Murphy to drive the Jeep. Wray sat in the front passenger's seat and Gardner sat in the rear passenger's seat. As they were about to pull away from the curb, a white car driving the wrong way down Michigan Avenue suddenly stopped. Milton exited the passenger's seat of the white car, pointed a gun at the men in the Jeep, and ordered them out of the vehicle. Milton fired two shots at Murphy and Wray as they exited through the driver's door and ran. Milton got into the driver's seat of the Jeep as Gardner was trying to exit through the rear passenger door. Milton yelled

5

at Gardner to get out of the Jeep and shot him in the back as he exited the vehicle. [Dkt. 16-1 at 2-3.] Murphy testified similarly to Wray about the shooting. [See Dkt. 16-15 at 466-473 (trial transcript).]

The State presented Wilson's recorded statement as evidence at trial, which Wilson contradicted through his live testimony. [Dkt. 16-1 at 3-4.] Specifically, Wilson testified that he was driving with his girlfriend, Tiffany Taylor ("Taylor"), and her children on March 22, 2004 when he saw the Jeep drive by. According to Wilson, he called Milton and drove to the area of 69th and Michigan, but left before Milton arrived. *Wilson*, 2020 WL 4334805, ¶ 9.

At the conclusion of trial, Wilson was convicted of first-degree murder and sentenced to 40 years in prison. *Wilson*, 2020 WL 4334805, ¶ 2.

### D. Direct Appeal

On direct appeal, appellate counsel moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). Wilson filed a response making five arguments that he believed to be meritorious:

1. His recorded statement should have been suppressed because police lacked probable cause to remove him from Cook County Jail;

2. His recorded statement to police was involuntary;

3. The State failed to present sufficient evidence of guilt;

4. Trial counsel was ineffective for failing to: (a) successfully argue Wilson's motion to suppress; and (b) call Taylor as a witness at trial; and

5. Appellate counsel was ineffective for moving to withdraw.

[See Dkt. 16-1 at 4-13.]

The Illinois appellate court granted appellate counsel's *Anders* motion and affirmed Wilson's conviction, concluding that all of his claims were meritless. [Dkt. 16-1 at 4-13.] Wilson raised the same claims in a petition for leave to appeal ("PLA") to the Illinois Supreme Court, which was denied on September 29, 2010. See *People v. Wilson*, 938 N.E.2d 530 (Ill. Sup. Ct. 2010).

### E.    Postconviction Proceedings

On May 18, 2011, Wilson filed a state post-conviction petition asserting that trial counsel was ineffective for failing to call Taylor as a witness at trial. *Wilson*, 2020 IL App (1st) 171995-U, ¶ 11. Wilson attached an affidavit from Taylor, in which she attested:

> [O]n March 22, 2004, she was with petitioner from 4:00 p.m. until 11:00 p.m. At one point, petitioner, Taylor, and their children went to a McDonald's restaurant located at East 79th Street and South Phillips Avenue. As they pulled out of the McDonald's drive through, petitioner saw the Jeep pass by and stated, "there goes Marcell's truck." They followed the Jeep until it arrived at 69th and Michigan, at which point petitioner called Milton using the cell phone speaker. Taylor heard petitioner tell Milton to bring an extra set of keys to retrieve the Jeep. Taylor attested that they left the area before Milton arrived. She also stated that she had contacted petitioner's trial counsel and told him what she witnessed the night of the incident. Trial counsel told Taylor that he would contact her before trial, but he never did so.

*Wilson*, 2020 WL 4334805, ¶ 12. The trial court summarily dismissed the petition as barred by *res judicata*. Wilson appealed. The Illinois appellate court reversed and remanded, finding that *res judicata* did not apply due to Taylor's new affidavit.

On remand, Wilson's appointed counsel submitted a new affidavit from Taylor, in which she stated that Wilson and Milton did not discuss guns when Wilson called

Milton about retrieving the Jeep. See *Wilson*, 2020 WL 4334805, ¶ 16. Appointed counsel also added a new claim that trial counsel was ineffective for not calling Wilson's grandmother, Willie Mae Wilson, to testify at his second suppression hearing. *Id.*, ¶ 17. This claim was supported by an affidavit from Wilson's grandmother, who stated that she would have testified that she spoke with Wilson on the phone while he was at the police station and that Wilson told her the police said they would not charge him with murder if he gave a statement. *Id*. The trial court dismissed the petition. Wilson appealed and the state appellate court affirmed, rejecting the ineffective assistance of counsel claims as meritless. *Id.*, ¶¶ 30-31. Petitioner filed a PLA raising only his ineffective assistance claim regarding Taylor. [Dkt. 16-12.] The Illinois Supreme Court denied the PLA on January 27, 2021. *People v. Wilson*, 163 N.E.3d 717 (Ill. 2021).

### F.    Habeas Petition

On March 9, 2022, Petitioner filed this habeas corpus action pursuant to 28 U.S.C. § 2254.  Petitioner raises the following five claims:

1.  trial counsel was ineffective for failing to: (a) investigate and call Taylor as a witness at trial [Ground One, Dkt. 8 at 5]; (b) call Wilson's grandmother as a witness at the hearing for the suppression motion [Ground Two, Dkt. 8 at 11]; and (c) successfully argue the motion to quash arrest and suppress his statement [Ground Three, Dkt. 8 at 13];

2.  the trial court erred in admitting his recorded statement [Ground Four, Dkt. 8 at 13] because: (a) it was involuntary due to police coercion; and (b) it was the product of an illegal arrest;

3.  the State failed to present sufficient evidence to prove him guilty beyond a reasonable doubt [Ground Five, Dkt. 8 at 20];

4. appellate counsel was ineffective for moving to withdraw [Ground Six, Dkt. 8 at 20]; and

5. actual innocence [Ground Seven, Dkt. 8 at 28].

## II. Legal Standards

The Court's review of Petitioner's petition for writ of habeas corpus is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). "The statute significantly limits the scope of our review; 'habeas relief cannot be granted for persons in custody pursuant to a judgment of a state court unless the adjudication of the claim: '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Sims v. Hyatte*, 914 F.3d 1078, 1086-87 (7th Cir. 2019) (quoting 28 U.S.C. § 2254(d)(1), (d)(2)).

Under the "unreasonable application" prong of § 2254(d)(1), "the state court's application of precedent must be 'objectively unreasonable,' not merely 'incorrect or erroneous.'" *McMullen v. Dalton*, -- F.4th --, 2023 WL 6456496, at *6 (7th Cir. Oct. 4, 2023) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)). "Said another way, the habeas petitioner needs to demonstrate that the state appellate court's decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "The existing law that applies is limited to that of the Supreme Court of the United States, which has

instructed the lower federal courts to uphold a state court conviction unless the record 'cannot, under any reasonable interpretation of the [Court's] controlling legal standard, support a certain ruling.'" *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)).

"'Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence.'" *Taylor v. Grounds*, 721 F.3d 809, 817 (7th Cir. 2013) (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010)). Any "determination of a factual issue made by a State court shall be presumed to be correct" and petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Under § 2254(d)(2), federal courts cannot declare "state–court factual determinations ... unreasonable merely because [we] would have reached a different conclusion in the first instance.'" *Dassey*, 877 F.3d at 302-303 (quoting *Brumfield*, 576 U.S. at 313-14). "AEDPA does not permit federal courts to 'supersede the trial court's ... determination' if a review of the record shows only that '[r]easonable minds ... might disagree about the finding in question.'" *Id.* Yet, "'deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief.'" *Id.*; see also *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008) (§ 2254(d)(2) sets "a daunting standard, but not insurmountable" (citing *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003))).

"AEDPA's deferential standard of review applies only to claims that were actually 'adjudicated on the merits in State court proceedings.'" *Makiel v. Butler*, 782

F.3d 882, 896 (7th Cir. 2015) (quoting 28 U.S.C. § 2254(d)). "Where state courts did not reach a federal constitutional issue, § 2254(d) deference applies 'only to those issues the state court explicitly addressed.'" *Id.* (quoting *Quintana v. Chandler,* 723 F.3d 849, 853 (7th Cir.2013)). "The operative decision under review is that of the last state court to address a given claim on the merits." *Id.*

## III. Analysis

### A. Timeliness

Federal habeas corpus petitions are subject to a one-year statute of limitations. See 28 U.S.C. § 2244(d)(1). In this case, the period commenced on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.*, § 2244(d)(1)(A); see also *Mayle v. Felix*, 545 U.S. 644, 662 (2005) (limitations period is "ordinarily" calculated under subsection (A) of § 2244(d)(1)). The State explains, and Wilson does not dispute, that the judgment became final on December 28, 2010, ninety days after the September 29, 2010 denial of his PLA. See *Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009) (judgment becomes final when time for filing certiorari petition expires); Sup. Ct. R. 13 (providing ninety days to file certiorari petition). The limitations period ran for 141 days until Wilson filed a postconviction petition on May 18, 2011. The limitations period was then tolled through January 27, 2021, when the Illinois Supreme Court denied his postconviction PLA. See 28 U.S.C. § 2244(d)(2) (limitations period is tolled while "a properly filed application for State post-conviction or other collateral review" is pending); see also *Lawrence v. Florida*, 549 U.S. 327 (2007). His habeas petition was due 224 days later

(365 − 141 = 224), by September 8, 2021, but he did not file it until March 9, 2022. The habeas petition was therefore approximately six months late.

Wilson argues that his petition should nevertheless be considered timely under equitable tolling principles. (Petitioner labels this "Ground eight" for the habeas petition. [See Dkt. 8 at 28.]) The "one-year period is subject to equitable tolling," if the petitioner shows that "(1) he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his path and prevented him from meeting the filing deadline." *Conner v. Reagle*, 82 F.4th 542, 550 (7th Cir. Sept. 12, 2023). "This is a case-by-case decision, guided by case law and precedent." *Moreland v. Eplett*, 18 F.4th 261, 270 (7th Cir. 2021). "Equitable tolling is a remedy reserved for the exceptional case and is therefore rarely granted." *Conner*, 82 F.4th at 550.

According to Wilson, he is entitled to equitable tolling because of a State-created impediment, the Governor's COVID-19 Disaster Proclamation on March 9, 2020. Wilson explains generally that while he has been incarcerated at Hill Correction Center, he has been "unable to have access to his legal material, unable to visit the prison's law library, but more importantly unable to gain access to his legal boxes which stored the necessary legal documentation and deadlines required in order to attempt the filing of this petition." [Dkt. 8 at 33.] Wilson further explains that although he has consistently and diligently tried to timely file his petition, "the continuing surges of COVID-19 within the State of Illinois, and more specifically, the back-to-back surges here in the Illinois Department of Corrections, the restrictive measures taken by the department of corrections and the Warden here at Hill

Correctional Center … created unusual circumstances that provides for application of the statutes tolling provision pursuant to 28 U.S.C. § 2244(d)(2)." [Dkt. 8 at 34.] In addition, he explains that he "tested positive for COVID-19 and was quarantined," which further delayed his ability to file his habeas petition. [*Id.*]

Wilson attaches as support several documents from the Illinois Department of Corrections, including:

- A "counseling summary" from the Prison's "clinical services" department, dated September 27, 2021, advising Petitioner that "Law Library lines are limited at this time" due to staffing vacancies "as well as due to Covid-19 protocols and precautions." [Dkt. 8 at 37.]

- An October 15, 2021 "counseling summary" from "Housing Unit 1" informing Wilson of the same. [*Id.* at 38.]

- The first page of an April 2, 2020 letter from the Governor and IDOC's Director informing persons in custody of the number of inmates and staff who had tested positive for COVID-19. The letter states that "[t]he Department's early decision to go on Administrative Quarantine, suspend in-person visitation, halt transfers, admissions, and non-emergency furloughs, along with the continued push for frequent handwashing and social distancing has helped mitigate the spread of the virus at the institutional level." [*Id.*]

- A similar, undated letter issued during a "second wave of COVID-19," which indicates that "[a]ll facilities remain on Administrative or Medical Quarantine." [*Id.* at 40.]

- A letter dated January 10, 2022 during a surge of the "Omicron variant." [*Id.* at 41.] This letter states that the CDC recommends a 14-day quarantine for persons who come in close contact with the virus, and a 10-day isolation period for individuals who test positive.

Respondent disputes that COVID-19 restrictions prevented Wilson from filing a timely habeas petition. Respondent emphasizes that Rule 2(c) of the Rules Governing § 2254 cases requires only that a petitioner "set forth in summary form

the facts supporting each of the grounds' specified in the petition." [Dkt. 15 at 8.] According to Respondent, Petitioner could have satisfied this standard regardless of Covid restrictions because he had personal knowledge of the facts giving rise to the claims in his petition, and personally prepared a response to his counsel's *Anders* petition that raised most of the claims found in his habeas petition in this case. [*Id.* at 8-9.]

The State relies on *Lloyd v. Van Natta*, 296 F.3d 630, 633-34 (7th Cir. 2002), which held that a habeas petitioner was not entitled to equitable tolling based on the unavailability of his complete trial transcript. The court explained that the lack of transcript did not prevent him from filing the petition because the petitioner was present at his trial and knew the basis on which he could have asserted prosecutorial misconduct (the "prosecution's improper reference that he 'beat [his girlfriend's child] to death'"). The State also cites *Vanderark v. Greene*, 2021 WL 2228059, at *3 (C.D. Ill. June 2, 2021), which rejected an equitable tolling argument made by a habeas petitioner who was restricted from accessing the law library due to the Covid-19 pandemic. The court observed that "[n]umerous habeas petitions have been filed in this Court over the last year, including from prisoners within the IDOC, despite limitations caused by the COVID-19 pandemic." *Id.* The court emphasized that "Petitioner had personal knowledge of the facts giving rise to the claims in his Petition." *Id.* Thus, "[w]hile his alleged inability to access to his legal records or conduct legal research between March and November 2020 could have affected the

14

extent of the content included in his Petition, it did not prevent him from filing a petition." *Id.*

Considering the record as a whole, the Court concludes that Wilson has not demonstrated that he diligently pursued his rights or that extraordinary circumstances prevented him from timely filing his petition. Wilson does not offer a substantive response to Respondent's argument that he had sufficient personal knowledge of his case and the grounds for his habeas petition to file the petition even without access to his legal papers or the law library. [See Dkt. 21 at 5-7.] He therefore has not shown that the prison's COVID-19 restrictions constitute "extraordinary circumstances," "beyond [his] control," that "prevent[ed] timely filing." *Moreland v. Eplett*, 18 F.4th 261, 271 (7th Cir. 2021).

Wilson has not demonstrated reasonable diligence, either. He does not provide an affidavit detailing the delays he experienced, and his briefs do not contain any detail. The exhibits attached to the petition do little to advance the "reasonable diligence" argument. The "counseling summaries" indicate that access to the law library was limited around the time the habeas petition had to be filed in September 2021. But they do not suggest there was *no* access during the period when Wilson needed to prepare the habeas petition (between January 27, 2021 and September 8, 2021).

Wilson also does not explain what information he needed from the law library in order to prepare his petition. The partial letters from the Governor and the IDOC Director suggest that the facility may have been under "quarantine" during the

15

relevant period. However, these letters do not contain any information suggesting if or how this restricted inmates' ability to access the library or their own legal papers. And as the third letter recognizes, at some point during this period vaccinations became available at the prison, reducing the need for restrictions that were imposed at the beginning of the pandemic. [Dkt. 8 at 41.] Under these circumstances, the Court is not persuaded that Wilson is entitled to equitable tolling. See *Vanderark*, 2021 WL 2228059, at *3; *United States v. Reeves*, 2022 WL 17832713, at *7 (N.D. Ill. Dec. 21, 2022) (petitioner not entitled to equitable tolling due to prison disruptions caused by COVID-19 pandemic, where he did "not explain with any specificity how the disruptions caused by the pandemic interfered with his ability to communicate with [his attorney] or pursue his claims"); *United States v. Jones*, 2021 WL 3033392, at *2 (N.D. Ill. July 19, 2021) (habeas petitioner failed to show that equitable tolling was appropriate due to prison COVID-19 procedures, where petitioner "provided no information describing exactly how the lockdowns and his placement in the [segregated housing unit] actually affected his ability to file his motion on time").

The Court has nonetheless reviewed the substance of Wilson's claims, and concludes that none would entitle him to federal habeas relief even if his petition had been timely filed.

### B. Actual Innocence[1]

The Court begins its analysis with Petitioner's claim of actual innocence, which he asserts as a "gateway" through which the Court may consider his untimely claims.

---

[1] Petitioner calls this Ground seven, while the State refers to it as Claim 5.

16

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or ... expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). "The actual innocence gateway exception is 'grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons.'" *Lund v. United States*, 913 F.3d 665, 667 (7th Cir. 2019) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

"To pass through the actual-innocence gateway to a merits review of a procedurally barred claim, the petitioner must have 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial,' and must persuade the district court that it is 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324.

Wilson argues that he is "currently in the process of gathering new and reliable evidence of his innocence that he believes is strong enough that a court now resolving the basic and fundamental issues of his innocence cannot have confidence in the present outcome of his trial." [Dkt. 8 at 28.] According to Wilson, "it is now common knowledge that many officers working at area 2 regularly engaged in the physical and mental abuse of suspects to extract statements and/or confessions for crimes for

17

which the suspects did not commit." [*Id.* at 29.] Wilson maintains that this "widespread systematic [abuse] of suspects at Area 2 provides a mountain of evidence that petitioner's statements were coerced, and thus the truth of the statements is now called into question." [*Id.*] Wilson has "always maintained that he was physically and mentally tortured into giving the statement, including the promise that he would not be charged with murder," and testified to that effect at his suppression hearing. [*Id.*] Wilson recognizes that the trial court found the prosecution witnesses' testimony more credible, but argues that the trial court's decision "would likely have been different had [the widespread] misconduct [in Area 2] been litigate[d] during the hearings." [*Id.* at 30.]

This showing falls short of satisfying the standard for gateway actual innocence claims. While Wilson represents that he is "gathering" supporting evidence, he has not provided any to the Court. Nor has he explained how evidence of how *other* defendants were treated by police officers (especially officers other than those who were involved in Petitioner's interrogation) would credibly demonstrate that *his* statement must have been obtained through physical or mental coercion. See, e.g., *McDowell v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (petitioner's affidavit in which he stated that police detective framed him and affidavits and transcripts that contained allegations of misconduct against detective in other cases did not constitute evidence of petitioner's actual innocence required to overcome procedural default of his claim that processes used to identify him violated his due process rights, where witnesses did not mention any irregularities in identification procedures, and

18

detective's alleged misconduct did not relate to petitioner's case, but only impeached his credibility); *Hinton v. Uchtman*, 395 F.3d 810, 822 (7th Cir. 2005) (Wood, J., concurring) (explaining that claiming misconduct in other cases is insufficient, the prisoner must demonstrate misconduct in his case). For these reasons, Wilson cannot "show that it is more likely than not" that, had the trial court known about certain unspecified evidence, it would have excluded Petitioner's statement or that, with the statement excluded, "no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Lund*, 913 F.3d at 667.

## C. Ineffective assistance of trial counsel

Petitioner raises three claims that challenge the effectiveness of his trial counsel. To prevail on an ineffective assistance of counsel claim, a petitioner must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A petitioner needs to demonstrate that: (1) 'counsel's representation fell below an objective standard of reasonableness,' and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Westray v. Brookhart*, 36 F.4th 737, 749 (7th Cir. 2022) (quoting *Strickland*, 466 U.S. at 687-88). "A petitioner is entitled to habeas relief only if he satisfies both of *Strickland*'s prongs." *Karr v. Sevier*, 29 F.4th 873, 880 (7th Cir. 2022) (quoting *Thill v. Richardson*, 996 F.3d 469, 476 (7th Cir. 2021)). The district court is not required "to approach the inquiry in the same order" as the state court "or even to address both components of the inquiry if the [petitioner]

makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; see also *Thurston v. Vanihel*, 39 F.4th 921, 929 (7th Cir. 2022).

"When a habeas petitioner challenges his conviction based on ineffective assistance of counsel, the Supreme Court's case law imposes a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Olvera v. Gomez*, 2 F.4th 659, 668 (7th Cir. 2021) (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)); see also *Woods v. Etherton*, 578 U.S. 113, 117 (2016). "AEDPA provides the first layer of deference to the state court, and substantive Sixth Amendment law provides the second layer of deference to defense counsel." *Olvera*, 2 F.4th at 668; see also *Minnick v. Winkleski*, 15 F.4th 460, 468 (7th Cir. 2021); *Gilbreath v. Winkleski*, 21 F.4th 965, 991 (7th Cir. 2021). First, the Court must "presume that 'counsel's representation was within the 'wide range' of reasonable professional assistance." *Gonzales v. Eplett*, 77 F.4th 585, 593-94 (7th Cir. 2023) (quoting *Harrington*, 562 U.S. at 104). "Second, we must defer to the state court's assessment of counsel's performance unless 'there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Gonzales*, 77 F.4th at 593.; see also *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011).

### 1. Trial counsel was ineffective for failing to call Tiffany Taylor as a witness[2]

In his first claim, Wilson argues that he was deprived of effective assistance when his trial counsel failed to properly investigate and call Taylor as a witness at

---

[2]      Wilson labels this Ground one, while the State refers to it as Claim 1a.

trial. [Dkt. 8 at 5.] In his state post-conviction petition, Wilson attached "a signed and notarized affidavit from Taylor in which she attested" to the following: "[O]n March 22, 2004, she was with Wilson from 4:00 p.m. until 11:00 p.m. At one point, Wilson, Taylor, and their children went to a McDonald's restaurant located at East 79th Street and South Phillips Avenue. As they pulled out of the McDonald's drive through, Wilson saw the Jeep pass by and stated, 'there goes Marcell's truck.' They followed the Jeep until it arrived at 69th and Michigan, at which point Wilson called Milton using the cell phone speaker. Taylor heard Wilson tell Milton to bring an extra set of keys to retrieve the Jeep. Taylor attested that they left the area before Milton arrived. She also stated that she had contacted Wilson's trial counsel and told him what she witnessed the night of the incident. Trial counsel told Taylor that he would contact her before trial, but he never did so." *Wilson*, 2020 IL App (1st) 171995-U, ¶ 12.

As noted above, the trial court summarily dismissed the state post-conviction petition as barred by *res judicata*. The Illinois appellate court reversed and remanded, finding that *res judicata* did not apply due to Taylor's new affidavit. On remand to the trial court for second stage postconviction proceedings, Wilson sought a third stage evidentiary hearing before the trial court.

Taylor had been listed as a defense witness for trial. Specifically, the record reflects that "Taylor had been listed as a witness in trial counsel's answer to the State's discovery motion," and that on June 10, 2008, "the parties discussed scheduling for the next trial date, during which trial counsel stated, 'I've got a

witness, Tiffany, I put her on my list. Her days off are on Mondays. She['s] asking if it's possible we can do it on a Monday.' Trial counsel stated that Taylor would 'be a short witness.'" *Wilson*, 2020 IL App (1st) 171995-U, ¶ 15.

The state trial court granted the State's motion to dismiss the petition. The Illinois appellate court affirmed, concluding that the trial court correctly dismissed at the second stage the ineffective assistance of trial counsel claims based on counsel's failure to call Taylor at trial. See *Wilson*, 2020 IL App (1st) 171995-U, ¶ 2. The state appellate court addressed both prongs of *Strickland*. On the performance prong, the appellate court concluded that "trial counsel was aware of what Taylor would have testified to and the decision to not call her was a matter of trial strategy rather than a constitutional defect." *Id.*, ¶ 29. As to the prejudice prong, the appellate court concluded that even taking Wilson's allegations as true, "[Wilson's] presence at the scene was never an issue at trial and Taylor's testimony would only have corroborated that [Wilson] called Milton, told him where the Jeep was located, and told him 'to come get his car or to bring keys.'" *Id*.

On this record, Wilson cannot show that the Illinois appellate court's decision was infected with any legal or factual errors, and certainly none that rise to the level necessary to prevail on a habeas petition. The Court focuses on the prejudice prong of the *Strickland* analysis, because it is dispositive. See *Strickland*, 466 U.S. at 697; *Thurston*, 39 F.4th at 929. Wilson fails to demonstrate that there is a reasonable probability that the result of the proceeding would have been different if Taylor had been called to testify.

To begin, the statute under which Wilson was convicted was for felony murder predicated on aggravated vehicular hijacking based on Wilson's accountability for Milton's actions. *Wilson*, 2020 IL App (1st) 171995-U, ¶ 2. In Illinois, a defendant is guilty of first degree murder if he kills another without justification while committing a forcible felony. 720 ILCS 5/9-1(a)(3)(2004). A defendant is accountable for another's felony murder if the defendant is accountable for the felony that accompanies the murder. *People v. Shaw*, 713 N.E. 2d 1161,1174 (Ill. 1998). An individual is legally accountable for the criminal conduct of another if before or during the commission of an offense, (1) the individual aids or abets another person in the planning or commission of an offense (2) with the intent to promote or facilitate the offense. 720 ILCS 5/5-2(c)(2004). An individual commits aggravated vehicular hijacking when they (1) take a vehicle from another (2) by force or threat of force (3) while armed with a firearm. 720 ILCS 5/18-4(a)(4)(2004).

Wilson does not dispute that the State proved Milton committed aggravated vehicular hijacking and felony murder. Wray testified that Milton pointed a gun at the occupants of the Jeep, ordered them out of the Jeep, shot and killed Gardner, and then drove the Jeep away. [Dkt. 16-1, at 4.] Taylor's proposed testimony goes only to whether Wilson should be held accountable for the murder that Milton committed. The proposed testimony set forth in her affidavit was in large part cumulative of other damaging evidence against Wilson concerning accountability: Wilson saw the stolen Jeep, followed it, and called Milton to come retrieve it at 69th and Michigan. Taylor's proposed testimony also does not exculpate Wilson. The only potentially exculpatory

23

detail provided in her affidavit is that she did not hear Wilson and Milton discuss a gun. But Petitioner's recorded statement to police revealed that his knowledge of Milton's gun came not from his phone call with Milton, but from his prior interactions with Milton. See *Wilson*, 2020 IL App (1st) 171995-U, ¶ 8 ("In the videotaped statement, petitioner acknowledged that he knew Milton carried a gun in such situations and admitted that he thought Milton would bring a gun to retrieve the Jeep."). Therefore, Taylor's testimony that she did not hear Milton and Wilson discuss a gun would not have created a reasonable probability of an acquittal. Accordingly, the state court correctly — and at the very least reasonably — concluded that trial counsel was not ineffective for declining to call Taylor as a witness at the trial.

### 2. Trial counsel was ineffective for failing to call Wilson's grandmother as a witness at the suppression hearing[3]

In his next claim, Wilson argues that his trial counsel was ineffective for failing to call his grandmother to testify at his second suppression hearing. According to Wilson, his grandmother's testimony would have "rebut[ted] the State's suggestions that petitioner's testimony during the hearing was the product of recent fabrication." [Dkt. 8 at 5.] In the state post-conviction trial court, Wilson submitted an affidavit from his grandmother, who stated that she would have testified that she spoke with Wilson on the phone while he was at the police station and that Wilson told her the police said they would not charge him with murder if he gave a statement. *Wilson*, 2020 IL App (1st) 171995-U, ¶ 17. The state appellate court rejected this ineffective assistance argument, concluding that the grandmother's "affidavit was not sufficient

---

[3]     Wilson refers to this as Ground one; the State labels it Claim 1b.

to show that the result of the suppression hearing would have been different had she testified." *Id.*, ¶ 31.

In its response to the habeas petition, the State argues that this claim has been procedurally defaulted because Wilson failed to include it in his petition for leave to appeal to the Illinois Supreme Court. [Dkt. 15 at 17; see also Dkt. 16-12 (petition for leave to appeal from the Illinois appellate court's judgment affirming Wilson's conviction and sentence on post-conviction review).] The State also argues that the claim fails on its merits.

The Court agrees with Respondent that his claim has been procedurally defaulted. "[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Therefore, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* In Illinois, the "established, normal appellate review procedure is a two-tiered system": most criminal appeals are heard first by the intermediate appellate courts, and a party may petition for leave to appeal a decision by the appellate court to the Illinois Supreme Court. *Id.* "Comity, in these circumstances, dictates" that a petitioner "use the State's established appellate review procedures before he presents his claims to a federal court." *Id.*; see also *United States ex rel. Parish v. Hodge*, 73 F. Supp. 3d 895, 902–03 (N.D. Ill. 2014) ("In Illinois, exhaustion of a claim requires that the petitioner directly appeal to the

Illinois Appellate Court and present the claim in a PLA to the Illinois Supreme Court." (citing *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007))).

Wilson's post-conviction PLA did not include his claim that trial counsel was ineffective for failing to call his grandmother as a defense witness at his suppression hearing. [See Dkt. 21 at 10.] Rather, Wilson appealed only the state appellate court's denial of his claim that trial counsel provided ineffective assistance by failing to call Taylor as a witness at trial. [See Dkt. 16-12 at 4, 14-16.] Therefore, this claim has been procedurally defaulted.

The Court recognizes that it "may excuse procedural default if a petitioner can show 'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'" *Booker v. Baker*, 74 F.4th 889, 894 (7th Cir. 2023) (quoting *Davila v. Davis*, 582 U.S. 521, 528 (2017)). Cause is "an objective factor external to the defense that impeded the presentation of the claim to the state courts." *Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th Cir. 2018). Wilson's briefs only peripherally address the issue of prejudice, and he makes no attempt to show cause for not including the claim concerning his grandmother in his PLA. *Id*. "Where, as here, a habeas petitioner fails to present a well-developed argument about cause and prejudice," the Court "need not address his procedurally defaulted claims." *Smith v. Williams*, 181 F. Supp. 3d 563, 569 (N.D. Ill. 2015) (citing *Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008)) (state prisoner procedurally defaulted his federal habeas claim that his confession was involuntary, where

prisoner did not fairly present the argument through one complete round of state post-conviction review, and the time for doing so had expired).

This claim also fails on its merits. The state appellate court rested its decision on the prejudice prong, determining that the grandmother's affidavit was not sufficient to show that the outcome of the suppression hearing would have been different with her testimony. *Wilson*, 2020 IL App (1st) 171995-U, ¶ 31. Although the state appellate court's decision contains little analysis beyond this conclusion, Wilson fails to demonstrate that the state appellate court unreasonably applied *Strickland*. "To make a difference at the hearing," her "testimony would have needed to overwhelm the State's countervailing evidence; otherwise, it would not have convinced the judge to suppress [the] statements." *McNary v. Lemke*, 708 F.3d 905, 916-17 (7th Cir. 2013).

Here, the grandmother's affidavit is relevant solely to the issue of whether police promised not to charge Wilson with murder if he told them "what happened." As the State emphasized to the state appellate court, she had no knowledge of whether there were false promises of leniency because she "did not hear the police tell petitioner that if he provided a statement, he would not be charged." *Wilson*, 2020 IL App (1st) 171995-U, ¶ 18. By contrast, at the suppression hearing the State offered testimony from all of the questioning officers, as well as the state's attorney who recorded his statement, that Wilson was not promised immunity from murder charges. See *Stechauner v. Smith*, 852 F.3d 708, 720-21 (7th Cir. 2017) (state court did not unreasonably apply *Strickland* in determining that defendant was not

prejudiced by his trial counsel's failure to call his mother and friends to support his motion to suppress statements made during interrogation at hospital, and thus defendant was not entitled to habeas relief on his ineffective assistance claim, where defendant's witnesses were not present during the interrogation and thus would not have been helpful to show that petitioner actually was in custody in the hospital.)

In addition, had his grandmother testified, her proposed testimony had the potential to be damaging. According to Wilson, police mentally and physically abused him before he called his grandmother. [Dkt. 16-15 at 305.] But according to his grandmother's affidavit, Wilson did not mention any of the alleged abuse when he spoke to her, only that the officers were promising leniency. *Wilson*, 2020 IL App (1st) 171995-U, ¶ 17. Thus, her testimony arguably would have provided the fact finder with reason to doubt his allegations and ultimately hurt his case. Consequently, the Court cannot say, applying the deference demanded by § 2254(d), that "no reasonable argument" could be made "that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105; see also *Meyers v. Gomez*, 50 F.4th 628, 643 (7th Cir. 2022).

### 3. Trial counsel was ineffective for failing to successfully argue the motion to quash his arrest and suppress his statement[4]

Wilson argues that he was denied effective assistance of trial counsel due to counsel's failure "to properly investigate the arrest, interrogation, investigative procedures and statutory law which was the factual basis for the filing of his pretrial

---

[4]    Wilson labels this argument Ground three; the State, Claim 1c.

motion to quash arrest/suppress." [Dkt. 8 at 13.] This argument overlaps in part with Wilson's criticism of counsel for failing to call Taylor and his grandmother, which the Court finds unpersuasive for the reasons explained above.

Wilson also argues that "trial counsel was most ineffective in his complete failure to properly investigate the rules and issues of law regarding Chicago Police Departments compliance with the Temporary Release of Inmates from the County Jail for investigative purposes." [*Id.* at 17.] Although he does not clearly spell out his argument, Wilson seems to be saying that police should have been required to obtain a warrant before they questioned him, rather than relying on procedures that gave the officers authority to determine probable cause. The state appellate court addressed this argument briefly, holding based on *People v. Hunt*, 914 N.E.2d 477 (Ill. 2009), Wilson's "removal from the county jail by police for questioning in this case was appropriate." [Dkt. 16-1 at 6.] In *Hunt*, 914 N.E.2d at 486, the Illinois Supreme Court held that "neither the plain language of section 19.5 of the County Jail Act nor our decision in *People v. Campa*, 840 N.E.2d 1157 (2005), requires a judicial order to transfer prisoners under that section." The court reasoned that the provision of the County Jail Act permitting release of persons in sheriff's custody on written request to aid the investigation of an unrelated matter only authorizes a temporary transfer of physical custody, not a final discharge from commitment at the jail, and, thus, does not require a judicial order to release a prisoner to law enforcement officials or the State's Attorney for the purpose of investigating an unrelated criminal matter. *Id.*

Wilson has not satisfied either prong of *Strickland*. He acknowledges that "Post-Conviction Counsel argued at length trial counsel's ineffectiveness for failing to determine the police compliance with directives in removing an inmate from jail and keeping him in police custody for interrogation without a warrant." [Dkt. 8 at 15.] He criticizes counsel for failing to cite the rules correctly [*id*. at 17], but does not cite the rules himself or explain how counsel's mistake resulted in the state trial court denying his motion to suppress. See *United States v. Smith*, 989 F.3d 575, 581 (7th Cir. 2021) (when counsel's allegedly deficiency was "failure to move to suppress evidence, a defendant must 'prove the motion was meritorious.'" (quoting *Long v. United States*, 847 F.3d 916, 920 (7th Cir. 2017)). He also does not discuss *Hunt* or address why its reasoning does not apply to his claim that officers failed to follow procedures for removing him from jail for questioning on an unrelated case.

Further, to the extent that Wilson is implying that there was a lack of probable cause to question him for Gardner's murder, the state appellate court reasonably rejected that argument. The Seventh Circuit has held that officers may interrogate a person in prison on one offense about the possibility that the inmate committed another crime without implicating protection against unreasonable seizures under the Fourth Amendment. *United States v. Childs*, 277 F.3d 947, 950-51 (7th Cir. 2002). Moreover, even if Wilson's change of location constituted an arrest, the state appellate court reasonably found that officers were acting on probable cause when they questioned him. "Probable cause to arrest exists 'when the facts and circumstances that are known to [the officer] reasonably support a belief that the

individual has committed, is committing, or is about to commit a crime." *Braun v. Village of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022). This "is not a high bar," requiring "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Doe v. Gray*, 75 F.4th 710, 718–19 (7th Cir. 2023). The officers cleared this requirement based on their knowledge that (1) Wray had identified Wilson as the man who gave him the Jeep, (2) Wray had identified Milton as the shooter, (3) the Jeep had been recovered close to Wilson's home, and (4) Wilson and Milton worked together in an auto theft ring. [Dkt. 16-1 at 5.] In sum, the state appellate court reasonably concluded that trial counsel was not ineffective for failing to successfully argue Wilson's motions to suppress.

> ### D.    The trial court erred in admitting Wilson's recorded statement because it was the product of police coercion and an illegal arrest[5]

In his next claim, Wilson argues that the trial court should have suppressed his statement as involuntary because officers did not inform him of his *Miranda* rights, falsely promised that he would not be charged with murder if he confessed, and mentally and physically abused him. [Dkt. 8 at 18-19.] "The Fourteenth Amendment's guarantee of fundamental fairness forbids the admission of an involuntary confession into evidence in a criminal prosecution." *Lentz v. Kennedy*, 967 F.3d 675, 691 (7th Cir. 2020). "The test for voluntariness asks, Is the confession the product of an essentially free and unconstrained choice by its maker?'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). "In making that determination,

---

[5]    Wilson calls this Ground Four, while the State breaks it into Claims 2a and 2b.

courts assess the 'totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Id.* "Although 'the law permits the police to pressure and cajole, conceal material facts, and actively mislead,' it draws the line at outright fraud, as where police extract a confession in exchange for a false promise to set the defendant free." *Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004) (quoting *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990)).

The state trial court heard testimony, including from the questioning officers, and the state's attorney, and Wilson himself, and credited the State's witnesses by concluding that the statement was voluntary. The state appellate court relied on the trial court's credibility findings in rejecting this claim. "State court findings, including credibility determinations, are presumed correct on federal habeas review, unless the petitioner rebuts those findings with 'clear and convincing evidence.'" *Woolley v. Rednour*, 702 F.3d 411, 426-27 (7th Cir. 2012) (quoting 28 U.S.C. § 2254(e)(1)). Wilson has not offered clear and convincing evidence that the trial court erred by deciding to credit the officers' and state's attorney's testimony over his. He simply claims that his testimony provided "a more plausible explanation of the illegal conduct and behavior." [Dkt. 8 at 19.]

Unlike this Court, which is limited to "looking at the cold pages of an appellate record," the state trial court was able to "observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact," and

other details. *Woolley*, 702 F.3d at 427; cf. *United States v. Weidenburner*, 550 Fed. Appx. 298 (7th Cir. 2013) (federal agents did not make false assurances of non-prosecution to drug defendant during noncustodial interviews, as would support claim that his statements in those interviews were involuntary, where trial court found after evidentiary hearing that agents had said only that they would make defendant's cooperation known to prosecuting authorities). There is nothing in the record (such as a video) that indicates that Wilson's statement was necessarily truthful, and the officers' necessarily false; rather, Wilson and the officers offer different accounts of their interactions leading up to Wilson's decision to make a statement to the state's attorney. On this record, Wilson is not entitled to relief on Ground Four.

### E. The State failed to present sufficient evidence to prove guilt beyond a reasonable doubt[6]

Wilson challenges the sufficiency of the evidence supporting his conviction. "Fourteenth Amendment due process requires that the state must present sufficient evidence to prove each element of an alleged crime." *Maier v. Smith*, 912 F.3d 1064, 1074 (7th Cir. 2019) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1987)). "The crime's substantive elements are defined by state law." *Id*. Where a habeas petitioner challenges the sufficiency of the evidence supporting his conviction, the district court must determine "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Saxon v. Lashbrook*, 873 F.3d 982, 987-88

---

[6]     Wilson labels this Ground Five; the State refers to it as Claim 3.

(7th Cir. 2017) (quoting *Jackson*, 443 U.S. at 319); see also *Smith v. Brookhart*, 996 F.3d 402, 413 (7th Cir. 2021).

"[H]abeas reviews of *Jackson* claims are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable." *Saxon*, 873 F.3d at 988. "In other words, it must be 'something like lying well outside the boundaries of permissible differences of opinion.'" *Rodriguez v. Gossett*, 842 F.3d 531, 538 (7th Cir. 2016) (quoting *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003)); see also *Makiel*, 782 F.3d at 896. This standard is "difficult to meet" and "highly deferential." *Saxon*, 873 F.3d at 988 (internal quotation marks and citations omitted).

The state appellate court rejected the sufficiency of the evidence challenge. The court explained that the trial evidence, viewed in the light most favorable to the prosecution, "showed that it was [Wilson] who told [Milton] the location of the Jeep and told him to come to that location to retrieve the Jeep while knowing that [Milton] was armed with a gun, and that the Jeep was occupied by three men." [Dkt. 16-1 at 8.] The court reasoned that "without [Wilson's] actions, [Milton] never would have arrived at the Michigan Avenue location, and Gardner never would have been killed." [*Id.*]

Wilson argues that there is insufficient evidence that he had the requisite intent to commit felony murder by accountability. [See Dkt. 8 at 22-23.] He claims

34

that "requesting that Milton bring keys to retrieve the vehicle" is "neither an objective nor subjective act that petitioner is participating in a vehicular hijacking." [*Id.* at 23.] He also maintains that, even if he and Milton specifically discussed a firearm when they spoke about the Jeep, there is insufficient evidence that Wilson "kn[ew] there was going to be anyone in the car when Milton arrived at the location." [*Id.*]

This argument ignores evidence in the record and fails to view the record in the light most favorable to the State. The evidence supports a conclusion that Wilson aided and abetted the planning of the aggravated vehicular hijacking—taking a vehicle from another "by force or threat of force … while armed with a firearm," 720 ILCS 5/18-4(4)(2004)—by calling Milton to tell him where the Jeep was and instructing him to get it back, while knowing (at a minimum) that Milton would be carrying a gun. The evidence also supports a finding of intent. In his recorded statement, Wilson admitted that Wray had taken the stolen Jeep from him and Milton. When Wilson saw Wray drive by in the stolen Jeep, he immediately called Milton and told him to come get it. Wilson knew that Milton usually carried a gun and thought Milton would bring the gun to take back the Jeep. *Wilson*, 2020 IL App (1st) 171995-U, ¶ 8. Milton shot Gardner while attempting to forcibly recover the Jeep. [*Id.*] In short, the record is not "'devoid of evidence from which a reasonable jury' could find the requisite guilt beyond a reasonable doubt," and therefore Wilson is not entitled to habeas relief based on his sufficiency of the evidence challenge. *Smith*, 996 F.3d at 413-14.

### F.  Appellate counsel was ineffective for moving to withdraw[7]

Finally, Wilson argues that he was denied effective appellate counsel when his attorney filed an *Anders* motion and sought to withdraw. [See Dkt. 8 at 27.] "'[T]he filing of an *Anders* brief that fails to point out meritorious issues can, in principle, constitute ineffective assistance.'" *Carrion v. Butler*, 835 F.3d 764, 778 (7th Cir. 2016) (quoting *Steward v. Gilmore*, 80 F.3d 1205, 1213 (7th Cir. 1996)). Because the Court has concluded that all of the claims are without merit, it "also reject[s] his related claim of ineffective assistance." *Id.*; see also *United States v. Stewart*, 388 F.3d 1079, 1085 (7th Cir. 2004) ("Stewart's counsel cannot have been ineffective for failing to pursue what we have concluded would have been a meritless [claim].").

## IV.  Certificate of Appealability and Right to Appeal

Under 28 U.S.C. § 2253(c)(2), "[a] certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." *Resendez v. Knight*, 653 F.3d 445, 446 (7th Cir. 2011).  An applicant makes a "substantial showing" where "reasonable jurists could debate whether … the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Based on the foregoing analysis, the Court concludes that Petitioner has not made a substantial showing as to any of his claims. Therefore, the Court declines to issue a certificate of appealability.

---

[7] Wilson calls this Ground six, while the State refers to it as Claim 4.

Wilson is advised that this is a final decision ending his case in this Court. If he wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. See Fed. R. App. P. 4(a)(1). Wilson need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he wishes for the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. See Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. See Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. See Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. See Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. See Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. See Fed. R. App. P. 4(a)(4)(A)(vi).

## V.     Conclusion

For all of these reasons, the habeas petition is denied. [Dkt. 1, 8].

Enter: 22-cv-1285
Date:  October 19, 2023

_____
Lindsay C. Jenkins
United States District Judge

37